**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| ELNORIA HOWELL, | ) |
| | ) |
|     **Plaintiff,** | ) |
| | ) |
| v. | )    **CIV. ACT. NO. 1:20-cv-502-TFM-M** |
| | ) |
| BALDWIN COUNTY BOARD OF | ) |
| EDUCATION, *et al.*, | ) |
| | ) |
|     **Defendants.** | ) |

## <u>MEMORANDUM OPINION AND ORDER</u>

Now pending before the Court are *Plaintiff's Motion to Strike the Expert Testimony of J.R. Brooks* (Doc. 108, filed 1/18/23), *Defendants' Joint Motion to Exclude William I. Sauser, Jr., PhD.*, (Doc. 113, filed 1/20/23), and *Defendants' Motion for Summary Judgment* (Doc. 114, filed 1/20/23). Having considered the motions, briefs, responses, replies, the evidentiary submissions in support of the motions, and the relevant law, the Court **GRANTED in part** and **DENIED in part** Defendants' Motion for Summary Judgment (Doc. 114).  For the purposes of summary judgment only, the Court did not consider J.R. Brooks and did consider William Sauser, Jr., but the motions to strike remain pending for resolution for trial purposes.

Because of the rapidly approaching pretrial date, the Court informed the parties of its rulings and issued a short summary order on January 12, 2024.  *See* Doc. 162.  The Court further set a *Daubert* hearing for February 9, 2024 and indicated a written opinion would follow with the detailed determination as to the motion for summary judgment.  This is that opinion.

The Court notes that the briefing by both sides made it unnecessarily more difficult to discern claims, and that references to evidence and arguments were often conflated, used interchangeably, and included almost 3000 pages of evidence in an apparent "data dump" on the

Court.  Parties rarely referenced counts and consistently used different claims interchangeably. Additionally, the Defendants fail to even acknowledge Count VI in their summary judgment and a word search of the document does not reveal it anywhere.  Defendants have an exceptionally short section on qualified immunity with a single reference to Fourteenth Amendment Equal Protection and does little analysis on the topic. Defendants, rather than filing separate motions for summary judgment as to the Board and the individual defendants to provide clear and distinct briefing, instead simply lump entire arguments without separation, designation, or clarity as to the claims brought by the Plaintiff.  Plaintiff fares little better as she conflates arguments and has bleed-over from one argument to the next.

The Court says all this to note that it spent considerable time and effort attempting to cull through everything to sort out "what-is-what."  Put bluntly, it is not for the Court to sort through all the different claims, counts, arguments, and thousands of pages of affidavits evidence to put them in some kind of cognizable order.  Yet, the undersigned and his staff made a valiant attempt to do so.

## I.    PARTIES, JURISDICTION, AND VENUE

For the purposes of this opinion, the Court will refer to the parties as follows:

- Plaintiff Elnoria Howell as "Plaintiff" or "Howell";

- Defendant Baldwin County Board of Education as "the Board";

- Defendant Superintendent of the Board Eddie Tyler as "Superintendent Tyler";

- Defendant Human Resources Director Jennifer Sinclair as "Sinclair";

- Members of the Board Michael Johnson, Andrea Lindsey, Tony Myrick, JaNay Dawson, Norma Lynch, Cecil Christenberry, and Shannon Cauley collectively as "Board

Members";[1]

- The Court will collectively refer to all the named defendants as "Defendants".

The Court has subject matter jurisdiction over the claims in this action pursuant to 28 U.S.C. § 1331 (federal question) and § 1343 (civil rights jurisdiction). Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events that gave rise to the claims in this matter occurred in this judicial district. No party contests jurisdiction or venue, and the Court finds adequate support for both.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

According to Plaintiff's Second Amended Complaint,[2] the Board hired Plaintiff on February 5, 2005, to serve as a Central Office Receptionist for the Board. Doc. 48 at ¶ 19. The Board promoted Plaintiff to the position of Central Office Secretary on July 1, 2014, and she attained tenure while serving in this position. *Id.* at ¶¶ 19–20. Plaintiff's primary responsibilities included:

> Human Resource clerical functions and duties and during her assignment to the Human Resource Department relevant herein was primarily responsible for duties related to new employee hires, verification of employment, employee finger printing, supplemental contracts and work agreements, unemployment claims, new hire transcripts for over 47 schools, front desk break/lunch duties, and new hire badges.

---

[1] In the July 27, 2021 Memorandum Opinion and Order, the Court dismissed as redundant the official capacity claims against Eddie Tyler, Michael Johnson, Andrea Lindsey, Tony Myrick, Janay Dawson, Norma Lynch, Cecil Christenberry, and Shannon Cauley. Eddie Tyler remained as a defendant in his individual capacity. *See* Doc. 26.

[2] The Court realizes now that it may have erred in its determination on the First Amended Complaint that it was not a shotgun complaint. *See* Doc. 26 at 9-11. In reviewing this case more carefully, the Court now determines that it does fall into the first type of shotgun pleading because the first sentence in each count incorporates by reference all preceding paragraphs. Regardless, the Court will not revisit the matter again as we are now at a fully briefed summary judgment motion and discovery is over. The Court mentions it now to put Plaintiff's counsel on notice that in future cases, the Court will adhere to a stricter application of the shotgun pleading discussion.

*Id.* at ¶ 23.

On April 16, 2018, Sinclair restructured Plaintiff's job duties, "requiring her to assist the full-time receptionist with her duties when on leave and/or during lunch and/or daily breaks," and cover the duties of the file clerk during a scheduled maternity leave, while similarly situated white employees were not required to assist with these additional responsibilities and duties.[3] *Id.* at ¶ 31. On April 23, 2018, Sinclair reprimanded Plaintiff for failing to perform her newly assigned duties, to which Plaintiff objected to the reprimand because they were not her "permanently assigned duties" and requested that the tasks be spread out among more of the staff members. *Id.* at ¶ 33. In May of 2018, Plaintiff was also asked to resume previously held duties such as new hire fingerprinting and badges with no assistance due a reduction in staff in the department, and no other employees were asked to perform these additional duties or assist Plaintiff. *Id.* at ¶¶ 34–36. Plaintiff alleges that she was denied promotions did not receive any additional compensation for the increase in duties, and that white co-workers historically received said promotions, pay increases, and were paid a higher salary to perform these same duties. *Id.* at ¶¶ 38–42, 55-57.

Plaintiff's objections to the increased duties were met with hostility, additional verbal reprimands, and being isolated by her superiors – creating a retaliatory and hostile work environment. Doc. 48 at ¶¶ 43-45. Plaintiff "openly addressed concerns" with co-workers, Sinclair, Superintendent Tyler, Assistant Superintendent Marty McRae, and the Board Members regarding the Board being "engaged in employment practices that discriminated against African Americans." *Id.* at ¶ 59. Due to her concerns remaining unaddressed, Plaintiff filed a formal complaint with Superintendent Tyler on June 21, 2018, which initiated an investigation. *Id.* at ¶

---

[3] The Court notes, that Plaintiff did include a single reference to Sinclair's harassment beginning in May of 2012, but it appears the 2012 entry was merely a typo as the timeline Plaintiff's issues with Sinclair and her job assignments began in May of 2018. *See* Doc. 48 at ¶ 26.

60. On June 26, 2018, Sinclair provided Plaintiff with her annual evaluation, which noted deficiencies in her work "including, but not limited to, improper attire and failure to properly perform her duties." *Id.* at ¶ 61. Since it was abnormal for Plaintiff to receive a low evaluation, Plaintiff objected because she was assigned the work of two people, no other similarly situated employee received an annual evaluation, and she again complained of disparate treatment and discrimination. *Id.* at ¶ 62.

On July 3, 2018, Sinclair issued Plaintiff a written reprimand for alleged deficiencies in the performance of her duties, which Plaintiff admits that she failed to record necessary documentation, but claims it was never enforced in the past. *Id.* at ¶ 65. At this time, Sinclair also informed Plaintiff that she would permanently assume the duties of the file clerk, to which Plaintiff objected because it would result in the performance of two previous full-time positions and again requested additional compensation for the additional duties. *Id.* at ¶ 66–67. However, on July 14, 2018, three white employees received promotions and/or pay increases. *Id.* at ¶ 70. On July 17, 2018, Assistant Superintendent McRae provided Plaintiff with the Board's response to her formal complaint, which upheld the additional duty assignments without addressing her verbal complaints of discrimination and the motivation behind the additional assignments. *Id.* at ¶ 71.

On August 7, 2018, Sinclair notified Plaintiff that she was being stripped of her Central Office Secretary duties in the Human Resources Department and had been reassigned to the position of Central Office Receptionist in the Human Resources Department; a demotion requiring "a substantial reduction in responsibility, skill, training and education." Doc. 48 at ¶ 74. Plaintiff filed "a formal written notice of contest and objections to [Superintendent] Tyler and the Board" on the grounds that the reassignment and demotion was retaliatory for her complaints of discrimination and that she was denied notice and a hearing as required by The Students First Act

of 2011, Code of Alabama, § 16-24(c)-6 and § 16-24(c)-8. *Id.* at ¶ 81, 86. On August 10, 2018, Superintendent Tyler rescinded the reassignment to Central Office Receptionist, but provided Plaintiff with a "notice of mandatory transfer from the Human Resources Department to the Transportation Department Bus Garage in her same position as a Central Office Secretary." *Id.* at ¶ 83. Plaintiff, again, submitted formal objections to the Board on the same grounds, however, the Board approved the transfer. *Id.* at ¶ 87-90. Subsequently, the Board posted her vacant position with two openings in the Human Resources Department and filled her position with two white females. *Id.* at ¶ 103.

Plaintiff alleges that although she has "remained classified as a Central Office Secretary after her transfer," her assigned duties correspond more to that of a receptionist pursuant to Defendants' classification schedule. *Id.* at ¶ 90. Plaintiff alleges that her newly assigned duties require "substantially less responsibility, skill, education, and training than typically performed by Plaintiff in the Human Resource Department and resulted in a constructive demotion." *Id.* at ¶ 90.

On October 11, 2018, Plaintiff filed her "Charge of Discrimination with the EEOC asserting complaints of discrimination and retaliation." *Id.* at ¶ 107. On October 13, 2020, Plaintiff filed her original complaint with this Court. *See* Doc. 1. On November 20, 2020, Defendants timely filed their first motion to dismiss. Doc. 16. On December 10, 2020, with leave of the Court, Plaintiff filed an Amended Complaint that re-alleged all the same counts against the same defendants, but with additional factual background. *See* Docs. 18–20. On December 24, 2020, Defendants filed their motion to dismiss as to the Amended Complaint. *See* Docs. 21, 22. The Court granted in part and denied in part the motion to dismiss. Doc. 26. Specifically, Count VIII of Plaintiff's amended complaint (Fourteenth Amendment Due Process claims) and the Board Members, in their official capacities, were dismissed, all other claims remained. Doc. 26.

Following the ruling, the Board, Eddie Tyler, and Jennifer Sinclair timely answered the first amended complaint. Docs. 29-31.

With leave of Court and without opposition from the Defendants, Plaintiff filed a second amended complaint on February 8, 2022, which again named the previously dismissed defendants, re-alleged the facts of the prior two complaints, and added additional claims for violation of the Equal Pay Act, 29 U.S.C. Section 206(d)(1) (Count VII) and re-alleging violations of her right to substantive and procedural due process under the Fourteenth Amendment (now under Count IX). Doc. 48. Defendants timely answered. Docs. 50, 51, 52.

After discovery concluded, on January 18, 2023, Plaintiff filed a motion to strike the expert testimony of J.R. Brooks with supporting memorandum. Docs. 108, 109. The next day, the parties filed a joint stipulation of dismissal of plaintiff's equal pay act claims. Doc. 111. On January 20, 2023, Defendants collectively filed a joint motion to exclude William Sauser, Jr. (Doc. 113) while the Board, Superintendent Tyler, and Sinclair filed a motion for summary judgment. Docs. 114, 116. Defendants jointly responded to Plaintiff's motion to Strike J.R. Brooks (Doc. 120); similarly, Plaintiff responded to Defendants joint motion to exclude William Sauser. Doc. 121. Both sides timely filed responses to the responses along with supplements to said responses.

In the interim, pursuant to order of this Court, the joint stipulation of dismissal of plaintiff's equal pay act claims (Doc. 111) was refiled as a Joint and Unopposed Motion for Summary Judgment as to Plaintiff's Equal Pay Act Claims (Doc. 118). In support of the motion, the parties stated there are no genuine issues of material fact as to Plaintiff's Equal-Pay-Act claim and Defendants were entitled to judgment as a matter of law. *Id.* As such, the Court granted the motion and entered summary judgment as to Plaintiff's Equal Pay Act Claims (Count VII).

This left for resolution the following:

(1) Count I – Disparate Treatment under Title VII and 42 U.S.C. § 1981 against the Board and Superintendent Tyler (in his official capacity);

(2) Count II – Failure to Promote under Title VII, 42 U.S.C. § 1981, 42 U.S.C. § 1983 against all Defendants;

(3) Count III – Hostile Work Environment against all Defendants;

(4) Count IV – Retaliation under Title VII and First Amendment against all Defendants;

(5) Count V – Demotion under Title VII against the Board and Superintendent Tyler (in his official capacity)

(6) Count VI – 42 U.S.C. § 1983 Equal Protection claim

(7) Count VIII – 42 U.S.C. § 1983 Fourteenth Amendment Failure to Supervise and Train against the Board and Tyler (in his individual and official capacities)

(8) Count IX – 42 U.S.C. § 1983 Fourteenth Amendment violations of procedural and substantive due process.

On January 20, 2023, Defendants filed their motion for summary judgment and brief in support. *See* Docs. 114, 115. After initially filing a motion in excess of the Court's page limits by filing an entirely separate proposed findings of fact, Defendants filed a motion to strike the response (Doc. 129) which the Court set for a status conference on March 2, 2023. The Court ultimately granted in part and denied in part the motion to strike and gave Plaintiff the opportunity to correct the response to comply with the Court's directives. *See* Doc. 134. The corrected response was filed on March 15, 2023 with the evidentiary support. *See* Docs. 136, 137. Defendants timely replied. *See* Doc. 142.

After receiving the extensive briefing and evidentiary submissions (over 3000 pages), the

Court finds no need for oral argument for the bulk of the issues presented[4] and determines the motions are ripe for review and adjudication. Following a telephone status conference on January 10, 2024, the Court issued a written order summarizing the ruling on motions indicating a written opinion would follow. Doc. 162.  This is that opinion.

### III.    STANDARD OF REVIEW

A party in a lawsuit may move a court to enter summary judgment before trial.  FED. R. CIV. P. 56(a) and (b).  Summary judgment is appropriate when the moving party establishes there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a); *see also Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) ("Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law.'").  "[T]he substantive law will identify which facts are material."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 91 L. Ed. 2d 202 (1986); *see also Ritchey v. S. Nuclear Operating Co., Inc.*, 423 F. App'x 955 (11th Cir. 2011) (quoting *Anderson*, 477 U.S. at 248).[5]  At the summary judgment juncture, the court does not "weigh the evidence and determine the truth of the matter," but solely "determine[s] whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249.  Only disputes about the material facts will preclude the granting of summary

---

[4] The Court will address in a later section a discussion on qualified immunity for the individual defendants which will discuss additional briefing and oral arguments.

[5] In this Circuit, "[u]npublished opinions are not considered binding precedent, but they may be cited as persuasive authority."  11th Cir. R. 36-2 (effective Dec. 1, 2014); *see also Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264, 1267 n.1 (11th Cir. 2015) (per curiam) ("Cases printed in the Federal Appendix are cited as persuasive authority.").

judgment.  *Id.*

The movant bears the initial burden of proof.  *Celotex*, 477 U.S. at 323.  A party must support its assertion that there is no genuine issue of material fact by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1).  The admissibility of evidence is subject to the same standards and rules that govern admissibility of evidence at trial.  *Clemons v. Dougherty County*, 684 F.2d 1365, 1369 n.5 (11th Cir. 1982) (citing *Pan-Islamic Trade Corp. v. Exxon Corp.*, 632 F.2d 539, 556 (5th Cir. 1980)).

Once the movant meets its burden under Fed. R. Civ. P. 56, the non-movant must go beyond the pleadings and designate specific facts showing there is a genuine issue for trial.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  "A genuine issue of material fact exists when 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Moore ex rel. Moore v. Reese*, 637 F.3d 1220, 1232 (11th Cir. 2011) (quoting *Anderson*, 477 U.S. at 248).  The court must view the facts and draw all reasonable inferences in favor of the non-moving party.  *Id.* (citing *Rosario v. Am. Corrective Counseling Servs., Inc.*, 506 F.3d 1039, 1043 (11th Cir. 2007)); *Greenberg*, 498 F.3d at 1265 ("We view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion.").  However, to avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586 (citations omitted).  Conclusory assertions, unsupported by specific facts, presented in

affidavits opposing the motion for summary judgment are likewise insufficient to defeat a proper motion for summary judgment. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). "Speculation does not create a *genuine* issue of fact." *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) (citation omitted) (emphasis in original). If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *See Anderson*, 477 U.S. at 249-50 (citations omitted). In short, summary judgment is proper after adequate time for discovery and upon motion against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case. *Celotex*, 477 U.S. at 322.

Finally, Fed. R. Civ. P. 56(e) also provides that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it; or (4) issue any other appropriate order." FED. R. CIV. P. 56(e).

## IV.     SECOND AMENDED COMPLAINT – PREVIOUSLY DISMISSED MATTERS

The Second Amended Complaint, as previously noted by the Court, once again makes allegations against Defendants in their official capacities despite those being previously dismissed. The parties seemingly gloss over this fact. Defendants raise it in a footnote in the summary judgment brief. *See* Doc. 116 at 3.[6] The Second Amended Complaint also includes the due process claim that was previously dismissed.

Normally the Court would not raise arguments not specifically briefed by the parties, but

---

[6] The Court uses the general PDF page number and not the page number on the brief at the bottom of the page. The Defendants included a table of content which changes the pagination. Therefore, the Court uses the PDF page number on the document.

in this case, the footnote acknowledges the prior dismissal, and the simple reality is that the official capacity claims cannot survive under any standard of review.  Therefore, the Court reiterates the prior dismissal of the parties in their official capacity claims.  This is seemingly supported by the fact that Plaintiff does not address the official capacity claims against the individuals despite them being included in the Second Amended Complaint.  The Court will address those parties first followed by the claim that was previously dismissed before turning to the remaining substance of the motion for summary judgment and response.

## A.    Official Capacity Claims Against Superintendent Tyler and the Board Members

Despite the dismissal of the individual board members and the official capacity claims against Superintendent Tyler in the Court's prior order, Plaintiff once again included them in her Second Amended Complaint.  *See* Doc. 26 at 8-9; Doc. 48 at 2-3, 21, 26, 29.

Plaintiff once again named the Baldwin County Board of Education as a defendant in this case, insofar as Plaintiff has named the elected members of the Board and the superintendent in their official capacities, the claims are redundant and due to be dismissed.  *See Barnett v. Baldwin Cty. Bd. of Educ.*, 60 F. Supp. 3d 1216, 1235 (S.D. Ala. 2014) (quoting *M.R. v. Bd. of Sch. Comm'rs of Mobile Cty.*, Civ. Act. No. 11-0245-WS-C, 2012 WL 2931263, at *2, 2012 U.S. Dist. LEXIS 99535, at *10 (S.D. Ala. July 18, 2012) ("Plainly, then, extensive authorities illustrate the well-entrenched principle that suits against both an official in his or her official capacity and the entity that official represents are redundant and unnecessary.")); *Walton ex rel. R.W. v. Montgomery Cty. Bd. of Educ.*, 371 F. Supp. 2d 1318, 1324 (M.D. Ala. 2005) (holding that the claims against the superintendent and board members "in their official capacities are redundant of the claims against the Board."); *Katherine S. v. Umbach*, No. Civ. Act. 00-cv-982, 2002 WL 226697, at *18, 2002 U.S. Dist. LEXIS 2523, at *52 (M.D. Ala. Feb. 1, 2002) ("When individual school administrators

are sued in their official capacities, they are considered officers of the board of education."); *Godby v. Montgomery Cty. Bd. of Educ.*, 996 F. Supp. 1390, 1403 (M.D. Ala. 1998) (holding that § 1983 claims "against officers in their official capacity are 'functionally equivalent' to claims against the entity that they represent" and applying it to the superintendent, principal, and teachers). Therefore, Plaintiff's claims against Superintendent Tyler and the Board Members, in their official capacities, are due to be dismissed.

**B.    Fourteenth Amendment Procedural and Substantive Due Process (Count IX)**

This claim was also previously dismissed in the July 27, 2021 Memorandum Opinion and Order. *See* Doc. 26 at 21-24. This applied to the Amended Complaint dated December 10, 2020 which listed this claim under Count VIII. Yet, when Plaintiff filed her Second Amended Complaint, she inexplicably re-included an identical claim as Count IX without objection from the Defendants. *Compare* Doc. 20 at 30-32 (Count VIII) *with* Doc. 48 at 31-33 (Count IX); *see also* Doc. 42 (Motion to Amend); Doc. 45 (Defendants responded to the motion to amend without objection and reserving defenses). Because the motion to amend was unopposed, the Court did not closely scrutinize it and therefore did not notice the addition before granting the request. *See* Doc. 47. Under the first Memorandum Opinion, it was dismissed when reviewing it under a Rule 12(b)(6) standard of review. *See* Doc. 26. Nothing has changed viewing it through the lens of a summary judgment standard of review. Therefore, the Court simply reiterates the analysis from its original opinion with minor modifications based upon the current controlling complaint and the briefing.

In Count IX, Plaintiff claims her Fourteenth Amendment due process rights were violated when she was not afforded notice and a hearing prior to being transferred and constructively demoted. Doc. 48 at ¶ 203. In her response to summary judgment, the sole reference to due

process appears to be when she references that the "purposeful avoidance of due process procedures is also significant and infers pretext." Doc. 136 at 43. She also states that Defendants "eviscerated the purposes and protections that were intended by the Students First Act." *Id.*

The Due Process Clause of the Fourteenth Amendment states, "nor shall any State deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. "The Supreme Court's interpretation of this clause explicates that the amendment provides two different kinds of constitutional protection: procedural due process and substantive due process." *McKinney v. Pate*, 20 F.3d 1550 (11th Cir. 1994) (citing *Zinermon v. Burch*, 494 U.S. 113 (1990)). "A violation of either of these kinds of protection may form the basis for a suit under [§] 1983." *Id.* (citing *Zinermon*, 494 U.S. at 125).

> [R]emaining largely outside the scope of substantive due process jurisprudence are tort law, *see Daniels*[ *v. Williams*], 474 U.S.[ 327,] 332, 106 S. Ct.[ 662,] 665[, 88 L. Ed. 2d 662 (1986))], and public employment law, *see, e.g., Bishop v. Wood*, 426 U.S. 341, 350, 96 S. Ct. 2074, 2080, 38 L. Ed. 2d 684 (1976), *and Board of Regents v. Roth*, 408 U.S. 564, 577–78, 92 S. Ct. 2701, 2709–10, 33 L. Ed. 2d 548 (1972).
>
> In short, areas in which substantive rights are created only by state law (as is the case with tort law and employment law) are not subject to substantive due process protection under the Due Process Clause because "substantive due process rights are created only by the Constitution." *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 229, 106 S. Ct. 507, 515, 88 L. Ed. 2d 523 (1985) (Powell, J., concurring). As a result, these state law based rights constitutionally may be rescinded so long as the elements of procedural-not substantive-due process are observed.

*McKinney*, 20 F.3d at 1556. "Whether an individual complains that a state lacks constitutionally adequate procedures for termination of employees or asserts that his particular hearing was not fair and impartial, he has raised only procedural due process concerns." *Id.* at 1559.

In this case, Plaintiff states that as a tenured Central Office Secretary, she "was entitled to procedural due process rights including proper notice and a hearing which were not afforded her denying her of procedural and substantive due process rights as required under Board's policies

and procedures and The Student First Act, Code of Alabama, 1975 §16-24C-1, *et seq.*"  Doc. 43 at ¶ 203.

> The Eleventh Circuit held:
>
> "Due process" cases typically focus on whether governments can take away property without affording its owner an adequate notice and opportunity to be heard.  *See, e.g., Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314-16, 70 S. Ct. 652, 657–58, 94 L. Ed. 865 (1950).  When courts analyze a procedural due process claim . . . they variously examine three things: (1) whether there is enough of a property interest at stake to be deemed "protectable"; (2) the amount of process that should be due for that protectable right; and (3) the process actually provided, be it before or after the deprivation.

*Greenbriar Vill., L.L.C. v. Mountain Brook, City*, 345 F.3d 1258, 1264 (11th Cir. 2003) (per curiam).  As to whether Plaintiff had a property interest in his job duties, the Supreme Court has recognized "property interests protected by procedural due process extend well beyond actual ownership of real estate, chattels, or money."  *Bd. of Regents of State Colls.*, 408 U.S. at 571-72.  "Property interests . . . are not created by the Constitution.  Rather they are created, and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."  *Id.*

The Student First Act, Ala. Code § 16-24C-1, *et seq.* ("SFA") controls this issue before the Court.  As a tenured, Central Office Secretary, Plaintiff is considered a "non-probationary classified employee" pursuant to the SFA. *See* Ala. Code § 16-24C-3(2) (defining Classified employee: "all full-time [. . .] secretaries and clerical assistants, [. . .], all other persons who are not teachers as defined herein who are full-time employees of a city or county board of education.").  Thus, the controlling subsection is Ala. Code § 16-24C-7(d) ("Transfers and Reassignments)", which states in relevant part:

(d) Non-probationary classified employees may be transferred to any position for

> which they are qualified within the agency or system by which they are employed [. . .], any work location that is under the control and jurisdiction of the institution, if the transfer is without loss of or reduction in compensation, written notice of the proposed transfer is issued to the employee by [. . .] the chief executive officer not less than 15 calendar days before [. . .] a vote thereon is taken by the governing board, and the transfer is effective not less than 15 calendar days after the date of the final decision. [. . .] Such transfers are not subject to challenge or review under this chapter.

Ala. Code. § 16-24C-7. Here, it is not disputed that Plaintiff was transferred from the Human Resources Department to the Transportation Department Bus Garage, that she retained the position of Central Office Secretary, and did not suffer a "loss of or reduction in compensation. Based upon a plain reading of the SFA, Plaintiff was not due a hearing under the applicable provision. *See* Ala. Code § 16-24C-8 (providing that deliberation on the merits will not be made prior to a hearing, "[w]henever this chapter affords an employee the right to be heard by the governing board [. . .]").

Plaintiff, however, was due notice fifteen calendar days prior to the Board's vote on the transfer. *See* Ala. Code. § 16-24C-7(d). Even reading the facts in a light most favorable to Plaintiff, she admits that the Board served notice prior to their vote on the proposed transfer. According to the Second Amended Complaint, the Board "served Plaintiff with notice of a mandatory transfer from the Human Resource Department to the Transportation Department Bus Garage as a Central Office Secretary" on August 10, 2018. Doc. 58 at 15, ¶83. Plaintiff informally complained about the retaliatory and discriminatory nature of the transfer the same day she was served notice. *Id.* at ¶ 85. "On August 28, 2018, Plaintiff submitted formal objections to the Board asserting the proposed mandatory transfer was discriminatory and retaliatory as a result of her complaints of discrimination on behalf of herself and other similarly situated African Americans and requesting a hearing under the Students First Act." *Id.* at 87. Later that same day, the Board approved the proposed transfer to the Transportation Department. *Id.* at ¶ 89.

Even reading the facts in the light most favorable to Plaintiff, she was not due a hearing for

a lateral transfer and by Plaintiff's own admission the Board provided timely notice and she was provided an opportunity to file formal objections to the proposed transfer. Therefore, Plaintiff's Fourteenth Amendment due process claim fails, and summary judgment is appropriate.

## V.   CURRENT SUMMARY JUDGMENT DISCUSSION AND ANALYSIS

The briefing on summary judgment from both sides was a challenge to decipher because they do not address claims separately and lump matters into "groupings" without reference to Count or defendant.  While this may make sense in certain situations, here it made it difficult for the Court to follow because it must jump around to figure out which claim goes under what section. The Court spent an inordinate amount of time trying to sort through the various arguments.

Regardless, the Court will attempt to provide clarity and will address them in groupings while also noting which claims/counts are included.

## A.    Discrimination (Counts II and V)

Under Title VII, it is unlawful for an employer "to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1). Similarly, § 1981 prohibits intentional discrimination based on race in the employment context.  42 U.S.C. § 1981(a); *Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 472 (11th Cir. 1999). Finally, § 1983, which provides a private cause of action against a state actor who violates federal constitutional or statutory rights, provides the exclusive remedy for a violation of § 1981 by a state actor. *See* 42 U.S.C. § 1983; *see also Bryant v. Jones*, 575 F.3d 1281, 1288 n.1 (11th Cir. 2009) ("[Section] 1981 does not provide [a] cause of action against state actors; therefore, § 1983 constitutes the exclusive federal remedy for violation by state actors of the rights guaranteed under § 1981.").

"A plaintiff may use either direct evidence or circumstantial evidence to show race discrimination." *Jenkins v. Nell*, 26 F.4th 1243, 1249 (11th Cir. 2002) (citing *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004)). "Direct evidence of discrimination is 'evidence which reflects a discriminatory . . . attitude correlating to the discrimination . . . complained of by the employee.'" *Wilson*, 376 F.3d at 1086 (quoting *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1357 (11th Cir. 1999)). "[D]irect evidence is evidence that 'if believed, proves the existence of a fact without inference or presumption.'" *Todd v. Fayette Cty. Sch. Dist.*, 998 F.3d 1203, 1215 (11th Cir. 2021) (quoting *Fernandez v. Trees, Inc.*, 961 F.3d 1148, 1156 (11th Cir. 2020)). "Only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitutes direct evidence of discrimination." *Id.*

In Count II, Plaintiff alleges she was denied a promotion and the substantial motivating factor for Defendants' denial of Plaintiff's promotion was her race. Doc. 48 at ¶ 130-131. Similarly, in Count V, Plaintiff brings a claim for demotion in violation of Title VII noting "as a direct result of Plaintiff's race, African American, and discrimination complaints, Defendants demoted and restructured Plaintiff's job duties and assignments and removed critical assignments to Plaintiff's classifications which required substantially less education, skill and responsibility." Doc. 48 at ¶ 169. As such, Plaintiff avers the adverse actions taken by Defendants were tantamount to a failure to promote, a demotion, and/or a material change in employment terms.

Here, Plaintiff does not present direct evidence of discrimination; therefore, the burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) applies.

> If a Title VII plaintiff establishes a prima facie case of discrimination, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *McDonnell Douglas* [ ], 411 U.S. [at] 802-03, 93 S. Ct. [at] 1824-25 [ ]). If the employer articulates a legitimate, nondiscriminatory reason for its actions,

> "the presumption of discrimination is rebutted, and the burden of production shifts to the plaintiff to offer evidence that the alleged reason of the employer is a pretext for illegal discrimination." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004); *see also Tex. Dep't of Cmty. Aff. v. Burdine*, 450 U.S. 248, 255-56, 101 S. Ct. 1089, 1094-95, 67 L. Ed. 2d 207 (1981). The plaintiff must meet the reason preferred head on and rebut it. *Wilson*, 376 F.3d at 1088. If the employer proffers more than one legitimate, nondiscriminatory reason, the plaintiff must rebut each of the reasons to survive a motion for summary judgment. *Chapman v. AI Transp.*, 229 F.3d 1012, 1037 (11th Cir. 2000) (en banc).

*Crawford v. City of Fairburn*, 482 F.3d 1305, 1308 (11th Cir. 2007).

After a plaintiff establishes a prima facie case, the Defendant must provide a legitimate, nondiscriminatory reason for the action. *Bryant,* 575 F.3d at 1308. Once the defendant articulates a legitimate, non-discriminatory reason for their actions, the burden falls on the plaintiff to show that the defendant's reasons were false, and that retaliation was the real reason behind the defendant's actions. *Id*.

### i.      Prima facie case

To establish a prima facie case of discriminatory failure to promote, a party must show that (1) she was in a protected group; (2) she was not given the promotion; (3) she was qualified for the position and (4) someone outside of the protected group was given the position. *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1333 (11th Cir. 1998). To establish a discriminatory demotion, Howell must show she (1) was a member of a protected class; (2) was qualified for the job; (3) suffered adverse employment action; and (4) was replaced by someone outside the protected class. *Hinson v. Clinch Cnty., Georgia Bd. of Educ.,* 231 F.3d 821, 828 (11th Cir. 2000). Lumped together, Plaintiff essentially argues different forms of adverse actions.

In summation, Plaintiff, a member of a protected class (African American), has alleged that Defendants discriminated against Plaintiff based on her race, which has resulted in Plaintiff suffering from a material change in employment terms, denial of promotion, and demotion.

Plaintiff asserts that these actions were taken intentionally, retaliatorily, and in violation of the Board's policies on racial discrimination in the workplace. Plaintiff set forth that she was qualified to perform the duties of the position that she held prior to being transferred and constructively demoted.

To support her position, Plaintiff points to several facts. In 2016, after Plaintiff confronted Sinclair about being the only employee in all of the Board Human Resources Department ("HR") remaining under a retired classification system, Sinclair reclassified Plaintiff, but added additional duties to Plaintiff's daily work assignments. Doc. 136 at 21. When Plaintiff was given these added File Clerk duties, historically performed by a higher classified employee as a full-time position, she requested an extra work agreement to increase her compensation, but the Board denied her request. *Id.* at 26.

In response, Defendants argue the actions at issue here fail to reach the level of substantiality required to establish an actionable adverse employment action. The Court notes at this juncture that the elements of Counts II and V, made by Plaintiff are not synonymous; however, because Defendants lumped the claims and bases their argument solely upon an alleged lack of adverse action, the Court is limited in its ability to analyze these matters. For the purposes of clarity, the Court finds the record is clear that Plaintiff is a member of a protected group (African American). In addition, Defendants do provide some additional argument that they raise for the first time in their reply on the remainder of the prima facie case. As such, the Court will also place its emphasis on the adverse employment action (i.e. demotion, failure to promote, and material change in employment terms) because if a single element fails, then the prima facie case fails.

To constitute an adverse employment action, the action must be materially adverse from the standpoint of a reasonable employee, such that it would dissuade a reasonable employee from

making a discrimination charge.  *Williams v. Apalachee Ctr., Inc.*, 315 F. App'x 798, 799 (11th Cir. 2009). This "is inherently fact-specific and 'depend[s] upon the particular circumstances' of the case." *Allen v. S. Commc'ns Servs., Inc.,* 963 F. Supp. 2d 1242, 1251 (N.D. Ala. 2013) While "not everything that makes an employee unhappy is an actionable adverse action," *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996), conduct that alters an employee's compensation, terms, conditions, or privileges of employment does constitute an adverse action under Title VII. *Bass v. Bd. of Cnty. Comm'rs, Orange Cnty., Fla.,* 256 F.3d 1095, 1118 (11th Cir. 2001).

To prove its occurrence, an employee must show a serious and material change in the terms, conditions, title, prestige, or privileges of employment. The adversity must be material; it is not enough that a transfer imposes some *de minimis* inconvenience or alteration of responsibilities. *Doe v. Dekalb Cnty. Sch. Dist.,* 145 F.3d 1441, 1453 (11th Cir. 1998). Further, the voluntary or involuntary nature of the transfer is not relevant to the question of whether it was unlawfully adverse. *Id*. at 1454.

Here, Plaintiff clearly articulates several work actions that she considers adverse.  First, Plaintiff alleges that although she "remained classified as a Central Office Secretary after her transfer," her assigned duties correspond more to that of a receptionist pursuant to Defendants' classification schedule resulting in a constructive demotion.  Doc. 48 at ¶ 90. Second, prior to transfer, Plaintiff alleges on April 16, 2018, Sinclair restructured Plaintiff's job duties, "requiring her to assist the full-time receptionist with her duties when on leave and/or during lunch and/or daily breaks," and cover the duties of the file clerk during a scheduled maternity leave, while similarly situated white employees were not required to assist with these additional responsibilities and duties. *Id.* at ¶ 31. Further, in July of 2018, Sinclair told Plaintiff that in addition to the duties assigned to her as a Central Office Secretary, Plaintiff would permanently assume the duties of the

file clerk which she asserts is a wholly separate position and resulted in Plaintiff being responsible for performing two full time jobs while being compensated for one. *Id.* at ¶ 66–67. Further, the Board denied Plaintiff's request for additional compensation to reconcile the additional assigned duties. *Id.*

Based on the above, it is not entirely clear that these would constitute adverse actions, but for the purposes of summary judgment, the Court will assume that they do.

### ii.     Legitimate Non-Discriminatory Reasons

Assuming, without deciding, that the adverse actions articulated by plaintiff established the requisite prima facie cases for Counts II and V, the burden shifts to the Board to "articulate a legitimate nondiscriminatory reason for its actions." *Crawford*, 482 F.3d at 1308 (citing *McDonnell Douglas*, 411 U.S. at 802-03). This is merely a burden of production and not persuasion. Put differently, the *McDonnell Douglas* framework does not shift the burden of persuasion to the defendant. Instead, once the employee establishes a prima facie case of discrimination, the burden of production is shifted to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Sims v. MVM, Inc.*, 704 F.3d 1327, 1332-33 (11th Cir. 2013). Yet, the ultimate burden of persuasion, remains on the employee. *Id.* at 1333.

Here, the Board articulated multiple legitimate nondiscriminatory reasons for its actions. The Board argues that although Sinclair allocated, and occasionally reallocated, specific tasks to Plaintiff, she did so for all employees in the department as part of an ongoing response to meet then-current needs and achieve operational efficiency. Further, the Board noted that (1) Plaintiff received all pay raises and benefits that were awarded to other similarly situated employees, (2) she was promoted over Caucasian applicants, (3) her workload was temporarily reduced or reassigned solely to accommodate exigent personal circumstances, (4) it was only after Plaintiff

rejected several alternative assignments (within her current job classification) that she was reassigned to a vacant receptionist position within the department, (5) that proposed transfer would not have entailed any loss of current or future compensation, and (6) when Plaintiff rejected the transfer, the board immediately rescinded the employment action. This satisfies the burden of production requirement.

### iii.    Pretext

Given the extensive list of non-discriminatory reasons articulated by the Board, their employer burden of production under *McDonnell Douglas* is met. Therefore, to defeat summary judgment, the burden shifts back to the Plaintiff who must demonstrate that Defendants articulated reasons were merely a pretext to mask the real discrimination. The plaintiff's burden is to demonstrate weaknesses or implausibility in the proffered legitimate reason so as to permit a rational jury to conclude that explanations given were not the real reason or that the reasons stated were insufficient to warrant the adverse action. *Rioux v. City of Atlanta*, 520 F.3d 1269, 1279 (11th Cir. 2008). "[I]f a jury reasonably could infer from the evidence presented that the employer's legitimate justification is pretextual, the question becomes whether the evidence, considered in the light most favorable to the plaintiff, yields the reasonable inference that the employer engaged in the alleged discrimination." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1326 (11th Cir. 2011).

The Eleventh Circuit has repeatedly emphasized that "[p]rovided . . . the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it . . . ." *Gogel v. Kia Motors Mfg. of Ga.*, 967 F.3d 1121, 1137 (11th Cir. 2020) (citations omitted). Further, if the employer proffers more than one legitimate, nondiscriminatory reason, the plaintiff must rebut each of the reasons to survive a motion for summary judgment. *Chapman*, 229

F.3d at 1037.

Defendants contended Howell suffered no adverse action, even with transfer, because her salary was not affected, and when plaintiff complained, the transfer was rescinded. In response, Plaintiff argues that whether the action taken were rescinded or involved economic loss is irrelevant because actions taken by Defendants, especially when viewed in totality, might reasonably deter plaintiff or others from filing complaints. Plaintiff further argues Defendants' failure to acknowledge and investigate her complaints could be sufficient to establish an adverse employment action. Thus, according to Plaintiff, the lack of economic change is pretextual; when reviewing these facts in their entirety, the "total weight" constitutes an adverse employment action. *See* Doc. 136 at 34.

Further, Plaintiff argues that Superintendent Tyler's stated reasons for Plaintiff's reclassification and transfer –Plaintiff's unhappiness –contradicts Sinclair's articulated reasons, which were that Howell's performance was deficient or that she refused to perform her duties are evidence of pretext. Doc. 136 at 35. In addition, Plaintiff states that Sinclair's evaluations of Plaintiff do not support Sinclair's articulated nondiscriminatory interest that Plaintiff's performance was deficient; thus, Sinclair's actions were pretextual. Finally, the fact that Plaintiff's alleged discrepancies were first noted by Sinclair in an evaluation performed five days after Plaintiff's formal complaint creates inferences that Sinclair's justifications for her actions are pretextual according to Plaintiff. These arguments fail.

An offer to transfer an employee is not an employment action; it is merely an offer. Providing an employee with a choice about where she works does not change the terms or conditions of her employment. *Baldwin v. Blue Cross/Blue Shield of Alabama*, 480 F.3d 1287, 1300 (11th Cir. 2007). In *Baldwin,* the court held that an employer's offer to transfer employee to

another office to resolve problems she and her supervisor were having was not tangible employment action upon which Title VII could be based. *Id.* The Court observed that "were it otherwise, an employee would be free to refuse any reasonable remedy the employer offered to resolve her complaint" while still attempting to hold the employer liable for discrimination. *Id.* at 1302.

Plaintiff argues that, in view of all the evidence, she "has presented sufficient evidence for a reasonable jury to find Defendants' reasons for their actions to be pretextual." Doc. 136 at 27. However, a party may not, by dumping evidentiary material into the record, unilaterally shift to the Court its burden of identifying evidence supporting its position. *Lillian*, 645 F. Supp. 3d at 1297. Plaintiff's failure to meet head on each of the non-discriminatory reasons raised by the Defendant results in summary judgment because it is not for the Court to cull through the record to find support for her arguments.

The ultimate burden of persuasion in a discrimination action always remains with the Plaintiff. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993). In *Hicks*, the Plaintiff established that he was the only employee disciplined for certain workplace violations whereas similar and even more serious violations committed by his co-workers were either disregarded or treated more leniently; and that his employer manufactured a confrontation in order to provoke Plaintiff. 509 U.S. at 508. The court found that the nondiscriminatory reasons provided by the Defendants were pretextual and not the true motive for Plaintiff's demotion and ultimate discharge. *Id.* However, although Plaintiff had proven the existence of a crusade for his termination, Plaintiff ultimately failed to carry his burden of proving that his race was determining factor in his employer's adverse employment actions. *Id.*

Here, the Court is satisfied that plaintiff has shown materially adverse actions taken against

her by Defendants. However, like the Plaintiff in *Hicks*, Plaintiff Howell fails to meet her burden of persuasion in showing that her race was the motivating factor behind the defendant's actions. This deficiency coupled with Plaintiff failing to "meet the reason head on and rebut" each and every legitimate, nondiscriminatory reason proffered by Defendants for their actions ultimately causes her discrimination claims fail. As a result, summary judgment is granted as to Counts II and V.

**B.      Disparate Treatment (Counts I and VI)**

In Count I, Plaintiff brings a disparate treatment claim under Title VII and § 1981.  Doc. 48 at ¶¶ 121-28. Plaintiff claims that Defendants "discriminated against Plaintiff on the basis of her race in matters of discipline, subjective decision making, policies, promotions, training, pay and other terms and conditions of employment which have resulted in disparate impact and treatment of Plaintiff." *Id.* at ¶ 123.  In Count VI, Plaintiff brings the same claims alleging Defendants' actions were also in violation of her equal protection rights under the Fourteenth Amendment pursuant to § 1983 based upon Defendants racially discriminatory conduct. *Id*. at ¶¶176-182.

Claims brought under Title VII, § 1981, and § 1983 all use the same analytical framework. *See Bryant*, 575 F.3d at 1296 n. 20 (11th Cir. 2009); *see also Chapter 7 Tr. V. Gate Gourmet, Inc.*, 683 F.3d 1249, 1256-57 (11th Cir. 2012) ("Title VII and 42 U.S.C. § 1981 have the same requirements of proof and use the same analytical framework.") (internal quotation and modification omitted). When § 1983 is used as a parallel remedy for violation of Title VII, the elements of the two causes of action are the same." *Id.* (citing *Hardin v. Stynchcomb,* 691 F.2d 1364, 1369 n. 16 (11th Cir. 1982)). Consequently, the Court will address the Title VII, § 1981, and § 1983 discrimination claims (disparate treatment) concurrently.  Any caselaw that applies to Title

VII will apply equally to § 1981 and § 1983.

### i.      Title VII

#### (a) Prima facie

"A plaintiff establishes a prima facie case of disparate treatment by showing that she was a qualified member of a protected class and was subjected to an adverse employment action in contrast with similarly situated employees outside the  protected class." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004).  As evidence of her disparate treatment claims, Plaintiff points to multiple incidents.

First, on April 16, 2018, Sinclair restructured Plaintiff's job duties, "requiring her to assist the full-time receptionist with her duties when on leave and/or during lunch and/or daily breaks," and cover the duties of the file clerk during a scheduled maternity leave, while similarly situated white employees were not required to assist with these additional responsibilities and duties. Doc. 48 at ¶ 31. Second, on April 23, 2018, Sinclair reprimanded Plaintiff for failing to perform her newly assigned duties, to which Plaintiff objected to the reprimand because they were not her "permanently assigned duties" and requested that the tasks be spread out among more of the staff members. *Id.* at ¶ 33.  Third, in May of 2018, Plaintiff states she was asked to resume previously held duties such as new hire fingerprinting and badges with no assistance due to a reduction in staff in the department, and no other employees were asked to perform these additional duties or assist Plaintiff.  *Id.* at ¶¶ 34-36.  Further, Plaintiff alleges that she was denied promotions, did not receive any additional compensation for the increase in duties, and that white co-workers historically received said promotions, pay increases, and were paid a higher salary to perform these same duties. *Id.* at ¶¶ 38-42, 55-57.

In addition, Plaintiff argues that overall Sinclair treated Caucasian employees differently

than African Americans in the terms and conditions of their employment including evaluations, discipline, training, promotions and pay with actions, such as (1) frequently scrutinizing the work of Howell and other African Americans and singling them out for clerical errors not addressed with Non-African American employees, (2) counseling Howell and other African Americans for socializing during work hours and breaks creating isolation at work while allowing Caucasian employees to take breaks together and socialize during work without issue, (3) assigning African Americans with heavy, out of class workload duties, without a salary adjustment while giving raises and promotions to similarly situated Caucasian employees who were not assigned additional duties. *See* Doc. 136 at 5-6. More specifically, Plaintiff alleges she was denied the training and support her similarly situated Caucasian counterparts were provided and was excluded from meeting and emails with pertinent information while simultaneously being penalized for lacking the information. *Id.* at 6.

Thus, Plaintiff uses circumstantial evidence to meet her burden of establishing the *prima facie* claim. Title VII and § 1981 race discrimination claims supported by circumstantial evidence are evaluated using the *McDonnell Douglas* framework. *See Harris v. Shelby County Bd. of Educ.*, 99 F.3d 1078, 1082-83 (11th Cir.1996).

### (b) Legitimate Nondiscriminatory Reasons

As previously discussed, the *McDonnell Douglas* evidentiary framework shifts the burden between the parties – from production for the defendant and to persuasion for the plaintiff to show sufficiently to survive summary judgment whether the true reason for an adverse employment action is discrimination; however, it is not a formulaic set of elements that the employee must prove to survive summary judgment. *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939 (11th Cir. 2023). Under *McDonnell Douglas*, a plaintiff who establishes a prima facie case is entitled to a

"legally mandatory, rebuttable presumption" that the employer intentionally discriminated against her, and a defendant's "failure to introduce evidence of a nondiscriminatory reason will cause judgment to go against it." *Id* at 945. It is up to the defendant to clearly articulate legitimate, nondiscriminatory reasons for its actions.

S.D. Ala. R. 56(a) and S.D. Ala. R. 56(b) requires the parties to provide "a specific, pinpoint citation" to the facts relied upon in their summary judgment briefs. It is not the task of this Court to scour the record to find evidence in support of the parties' positions. *First Baptist Church of Lillian v. Church Mut. Ins. Co.*, 645 F. Supp. 3d 1288, 1297 n.6 (S.D. Ala. 2022); *see also July v. Board of Water and Sewer Comm'r of City of Mobile,* Civ. Act. No. 1:11-cv-635-WS, 2012 U.S. Dist. LEXIS 169199 n. 10, 2012 WL 5966637 n. 10 (S.D. Ala. Nov. 29, 2012) ("[t]he Court cannot and will not make a party's summary judgment argument for it.") "A passing reference to an issue in a brief [is] insufficient to properly raise that issue." *Transamerica Leasing, Inc. v. Institute of London Underwriters*, 430 F.3d 1326, 1331 n. 4 (11th Cir. 2005).

Defendant argues that although Sinclair allocated and occasionally reallocated specific tasks to Plaintiff, her actions were nondiscriminatory as she did so for all employees in the department as part of an ongoing response to meet then-current needs and achieve operational efficiency after an employee left HR in 2019 because the HR department was overstaffed by comparison to other school systems of comparable size throughout the state. Doc. 116-1 at 26. The Board notes that (1) Howell received all pay raises and benefits that were awarded to other similarly situated employees, (2) that she was promoted over Caucasian applicants and conversely, other similarly situated African Americans in the department received promotions (*Id.* at 30), and (3) that her workload was temporarily reduced or reassigned to accommodate exigent personal circumstances. Doc. 116 at 31 (citing Doc. 116-1).

The problem is that on summary judgment Defendant conflates their discussion on Counts, I, II, and V without reference to any of them individually. It leaves the Court to extrapolate that the legitimate, nondiscriminatory reasons provided seem to relate more towards the failure to promote and demotion claims and have little to do with disparate treatment. Therefore, while the second step of the *McDonnell Double* framework is one of production, the Court will not cull through the entirety of the briefing and record to figure out whether Defendant has satisfactorily met their burden of production.

Additionally, as discussed in the next sub-section, Defendants failed to move for summary judgment on Count VI as to the Board. As Counts I and VI are so intimately related both in questions of law and fact, reviewed in the light most favorable to the Plaintiff, a reasonable jury could find evidence of disparate treatment. Therefore, summary judgment is denied as to Count I.

To be clear for the purposes of trial, Plaintiff's claims for failure to promote (Count II) and Demotion (Count V) were already eliminated by the prior sections discussing summary judgment. All that Plaintiff may present at trial is the evidence of disparate treatment – not failure to promote or demotion. This narrows the field considerably.

### ii.     Count VI

A review of the Defendants' motion shows that they fail entirely to discuss Count VI. There is not a single reference to the count in substance. The only brief reference to Equal Protection which is raised in a single sentence of their summary judgment brief when they state "Howell alleges violation of her First Amendment and Fourteenth Amendment Equal Protection rights." Doc. 116 at 46. The Court performed a word search to ensure it did not miss it otherwise referenced (using Count VI, Count 6, and Count Six). Therefore, when it comes to the Board, Defendants failed to move for summary judgment and the Court will not do their job for them nor

will it extrapolate a summary judgment argument by inference to other similar/related arguments. The claim will proceed against the Board especially given that its facts are intertwined with those for Count I.

Turning to the individual defendants, the complete lack of analysis about qualified immunity ensures the Court's inability to cull through their evidence.  Four paragraphs of black letter law with no fact-based application yields nothing for the Court to analyze. Defendants make a blanket assertion that Howell cannot meet the burden to show she had a clearly established constitutional right under the facts of this case. *Id*. The Defendants' reply fares no better with its minimalistic approach seemingly expecting the Court to take the leap with them to perform a detailed qualified immunity analysis in the legal void. *See* Doc. 142 at 16. While the Court must address qualified immunity at the earliest stage of the process, the Court cannot perform a sufficient analysis when Defendants put forth so little effort to sharpen and clarify the immunity issue.  The Court declines to do their job for them.

Plaintiff does a little better in her response. At the very least, she cites to relevant caselaw that notes that laws proscribing intentional race discrimination in the workplace are clearly established.  *See* Doc. 136 at 49-50 (citing *Yeldell v. Cooper Green Hosp., Inc.*, 956 F.2d 1056, 1064 (11th Cir. 1992) and *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1478 (11th Cir. 1991)).

Yet, the Court also notes that, unlike the header for the other counts, Count VI in the complaint does not specify exactly which defendants against whom the count is asserted, though the Board, Eddie Tyler, and Jennifer Sinclair are all referenced in the body of the paragraphs. Therefore, the Court will defer making a final determination on qualified immunity as to the individual defendants and will hold this issue in abeyance for further briefing and oral arguments

which the Court will set before trial. The Court will issue a separate order on the briefing requirements and schedule.

## C.    Retaliation (Count IV)

In Count IV of her Second Amended Complaint, Plaintiff sets forth a claim for retaliation under both Title VII and the First Amendment. Doc. 48 at ¶¶ 149–65. Plaintiff asserts that she "filed complaints and grievances with the Board regarding concerns of discriminatory practices engaged in by Board and openly opposed the discriminatory actions and treatment by Sinclair, Tyler and the Board," which she asserts was a matter of public concern. *Id*. at ¶¶ 149–50. Plaintiff further asserts that as a "direct result of her complaints and grievances, the Board began to harass and threaten [her], [. . .] restructured [her] job duties and assignments, removed critical assignments, transferred and demoted [her], reprimanded [her], issued [her] poor evaluations, scrutinized and isolated [her] from other employees and took other actions which interfered with Plaintiff's ability to perform her duties" in "retaliation for her open opposition and expression of concerns regarding possible discriminatory practices by Sinclair and Board." *Id*. at ¶¶ 151–52. As a result, Plaintiff claims that Defendants "retaliated against [her] in violation of Title VII and 42 USC Section 1983 for her exercise of federally protected rights" and "denied Plaintiff her freedom of speech and/or association guaranteed her by the First Amendment to the U.S. Constitution." *Id*. at ¶¶ 156-157.

Succinctly, Plaintiff alleges that she filed complaints and lodged grievances with the Board indicating that they were engaged in discriminatory practices and she "openly opposed the discriminatory actions." Plaintiff further alleges that the Board "engaged in a systemic pattern and practice of discrimination" in retaliation to her complaints and open opposition.

i.      **First Amendment**

A government employer may not demote or discharge a public employee in retaliation for speech protected by the First Amendment. *Alves v. Bd. of Regents of the Univ. Sys. of Georgia*, 804 F.3d 1149, 1159 (11th Cir. 2015) (citing *Bryson v. City of Waycross*, 888 F.2d 1562, 1565 (11th Cir. 1989)).  However, the inquiry hinges on what is deemed protected speech.  "[S]tatements by public officials on matters of public concern must be accorded First Amendment protection despite the fact that the statements are directed at their nominal superiors." *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cty., Illinois*, 391 U.S. 563, 574 (1968) (citations omitted).  If it is found that the employee did not speak "as a citizen on a matter of public concern," then the speech is not protected and "the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006).  However, if it is found that the employee did speak "as a citizen on a matter of public concern," then the "question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Id.* (citing *Pickering*, 391 U.S. at 568).

In essence, to "determine whether retaliation against a public employee for her speech violates the First Amendment," the plaintiff must show:

> (1) she was speaking as a citizen on a matter of public concern; (2) her interests as a citizen outweighed the interests of the [government] as an employer; and (3) the speech played a substantial or motivating role in the adverse employment action. If the plaintiff establishes these elements, the burden shifts to the defendant to prove [(4)] it would have made the same adverse employment decision absent the employee's speech.

*Leslie v. Hancock Cty. Sch. Dist.*, 994 F. Supp. 2d 1339, 1343 (M.D. Ga. 2014) (quoting *Vila v. Padron*, 484 F.3d 1334, 1339 (11th Cir. 2007)).

Defendants argue that Plaintiff's account of the events that transpired are not accurate; and,

more importantly, that the purpose and subject of Plaintiff's expressions were not to highlight a matter of public concern but to expose a personal discrimination for personal benefit. While the Court agrees that many of Plaintiff's allegations consisted of complaints that do advocate on behalf of herself, Plaintiff also alleged instances of complaints about pay disparities and disparate treatment in assigned duties, discipline, and accommodations along with formal and informal complaints openly opposing systemic discriminatory practices in HR. Thus, viewing the facts in light most favorable to the Plaintiff, the first and third elements of the First Amendment violation are met.

Although Plaintiff alleges she was retaliated against for asserting complaints of discrimination, she fails to address the second element of this claim. Defendants argue that the employment actions would have been taken regardless of Plaintiff's alleged speech as part of an ongoing response to meet then-current needs and achieve operational efficiency In response, Plaintiff makes an extensive and compelling argument that the close temporal proximity of Plaintiff's complaints to the start of adverse actions taken against her (less than a week) makes it reasonable to infer that the activity was the cause of the adverse employment decision. However, Plaintiff skipping to an argument on pretext does not relieve her of the burden to *first* meet the prima facie elements of the claim. Plaintiff did not argue that her interest as an employee outweighed the interests of the Board, as an employer, in its articulated nondiscriminatory reason for the action, an effort to meet the personnel needs of an ever-growing school district. Accordingly, Plaintiff's § 1983 First Amendment retaliation claim in Count IV fails and summary judgment is appropriate.[7]

---

[7]  As the claim fails in substance, the Court need not address qualified immunity in detail as to the individual defendants.  However, as noted in a prior section, it would have been difficult for the

### ii.    Title VII

Plaintiff further contends, in violation of Title VII, she was subjected to materially adverse employment actions for having shared with Assistant Superintendent McRae her belief that the allegedly unfair treatment she described in her June 21, 2018, letter to Superintendent Tyler and verbally to McRae after she filed her complaint, were racially motivated. Doc. 136 at 30.

To establish a prima facie case for retaliation under Title VII, the plaintiff must show: "(1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) she established a causal link between the protected activity and the adverse action." *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1181 (11th Cir. 2010) (citing *Bryant v. Jones*, 575 F.3d 1281, 1307 (11th Cir. 2009)).  A plaintiff making a retaliation claim must establish that "[his] protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Tex. S.W. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013).  After a plaintiff establishes a prima facie case, the Defendant must provide a legitimate, nondiscriminatory reason for the action.  *Bryant,* 575 F.3d at 1308.  Once the defendant articulates a legitimate, non-discriminatory reason for their actions, the burden falls on the plaintiff to show that the defendant's reasons were false, and that retaliation was the real reason behind the defendant's actions.  *Id.*

### (a) Prima Facie Case

Here, Plaintiff asserts that hostile and excessive assignment of duties as well as her reclassification were retaliation. Doc. 136 at 31. As detailed in the First Amendment analysis above, Plaintiff has sufficiently met the first and second elements of the claim alleging complaints of pay disparities and disparate treatment in assigned duties, discipline, and accommodations along

---

Court to conduct a detailed qualified immunity analysis because Defendants simply assert the argument without detail.

with formal and informal complaints openly opposing systemic discriminatory practices. However, she fails to establish the "but-for" causal link. Plaintiff claimed the hostile work environment and excessive assignments are what led to the protected speech that Plaintiff claims caused the retaliation. Clearly, defendants could not retaliate prior to the action that plaintiff alleges was the motivation of the speech which was the "but for" cause of the retaliation.

### (b) Legitimate Non-Discriminatory Reasons

Further, even if Plaintiff had established the requisite prima facie case, here, the Board articulated numerous legitimate nondiscriminatory reasons. First, they argue that Sinclair allocated and occasionally reallocated specific tasks to all employees in the department as part of an ongoing response to achieve operational efficiency. Second, they note that Plaintiff's June 21, 2018, formal complaint did not mention any type of discrimination and was solely related to workload, and thus, Plaintiff did not assert speech for the defendant to retaliate against. Third, because Superintendent Tyler never informed Sinclair about the complaint, Sinclair's actions could not be considered retaliation against protected speech. Finally, Plaintiff's lateral transfer was based on the Plaintiff's complaints about workload and the board attempting to resolve the work-related complaints of Plaintiff while meeting the needs of the board; thus, it was not an adverse employment action as her job title and pay remained the same.

### (c) Pretext and Conclusion

Plaintiff did not meet the evidentiary burden to survive summary judgment on her retaliation claims in in violation of Title VII and 42 U.S.C. § 1983 pursuant to the First Amendment. To be clear, while Plaintiff attempted to offer some evidence of retaliation, she failed, under both causes of action, to address and establish (1) the casual connection and show how the alleged protected speech (complaints about discriminatory and disparate treatment) was the nexus

for the specific adverse actions (increased work assignments and disparate treatment) when many of the alleged adverse actions predated the alleged protected speech, or (2) that the Board, Sinclair, and/or Tyler had actual knowledge of her alleged protected speech prior to their alleged retaliatory actions.

Thus, even viewing the evidence in light most favorable to Plaintiff, the Court cannot find that Plaintiff's speech played a substantial or motivating role in the employment actions of the defendant. Further, Plaintiff neither rebutted Defendants argument that the employment actions would have been taken regardless of Plaintiff's alleged speech as part of an ongoing response to meet then-current needs of the district nor did she establish how her interests as a citizen outweighed the interests of the Board, as an employer, in its effort to meet personnel needs. As such, Plaintiff's retaliation claims under Count IV fail, and summary judgment is appropriate.

**D.   Hostile Work Environment (Count III)**

In Count III of her Second Amended Complaint, Howell alleges that she was subjected to a hostile, offensive, and abusive working environment by her supervisor, Sinclair, as a direct result of her being African American. Doc. 48 at ¶¶ 136-148. More specifically, Plaintiff alleges that Plaintiff's objections to increased duties were met with hostility, additional verbal reprimands, and being isolated by her superiors, creating a retaliatory and hostile work environment. Doc. 48 at ¶¶ 42-43.

A hostile work environment claim under Title VII is established upon proof that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21 (1993). A plaintiff wishing to establish a hostile work environment claim must show: (1) that she belongs to a protected group;

(2) that she has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee, such as national origin; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability. *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002). In evaluating the objective severity of the harassment, courts consider: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance. *Allen v. Tyson Foods,* 121 F.3d 642, 647 (11th Cir.1997) (citing *Harris,* 510 U.S. at 23).

A "bedrock principle" is that not all subjectively offensive language in the workplace violates Title VII. *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 809 (11th Cir. 2010) (en banc). Title VII is not a "general civility code. *Id.* (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). As the Eleventh Circuit has observed, Title VII "does not prohibit harassment alone, however severe and pervasive. Instead, Title VII prohibits discrimination, including harassment that discriminates based on a protected category." *Id.* (quoting *Baldwin,* 480 F. 3d at 1301-02).

A plaintiff must prove that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Fernandez v. Trees, Inc.*, 961 F.3d 1148, 1152 (11th Cir. 2020) (quoting *Harris*, 510 U.S. at 21). In *Fernandez,* the Plaintiff provided "ample evidence" that the harassment he faced was frequent—he testified that his employer made derogatory remarks, including phrases such as "shitty Cubans," "fucking Cubans," and "crying,

whining Cubans" on a near-daily basis. *Id.* at 1153. Further, Fernandez' co-workers identified more than 10 specific examples of discriminatory remarks made during the relevant period. *Id.*

In contrast, eight specific instances of alleged harassment over course of two years were not sufficiently severe or pervasive so as to alter terms and conditions of his employment in violation of Title VII of Civil Rights Act. *Alexander v. Opelika City Sch.*, 352 F. App'x 390, 392 (11th Cir. 2009). In *Alexander,* the Eleventh Circuit held there was not sufficient evidence presented for a reasonable person to conclude that the harassment was frequent where Plaintiff, an African American male, testified that he was called "boy" constantly but could only recall eight specific instances over the course of two years where he was called "boy." *Id.* at 391. Second, in examining the severity of the alleged conduct, the court noted that the most severe comment was made by his supervisor (how to tie a noose around a person's neck) was not directed toward Plaintiff and Plaintiff testified that he did not know whether this comment referred to black people. Further, none of the alleged racial comments contained threats of physical violence, and Plaintiff did not demonstrate that the comments interfered with his job performance. *Id* at 393.

In the present case, the Court acknowledges that the behavior alleged by Plaintiff of her employer would not lead to as a positive work environment as one might prefer.  However, the severity of the conduct does not rise to the level of physically threating or humiliating. Plaintiff never alleges that any of the Defendants ever directed a racial slur, used any racially incentive language, or made any racially motivated comments. Instead, she points to an allegedly unwarranted verbal and written counseling, additional work duties, a notation about her attire in a written reprimand, and African Americans being singled out and questioned about lunch breaks, coffee breaks, vacations requests, and their work being scrutinized.  Similar to the Plaintiff in *Alexander*, the lack of specificity in Plaintiff's allegations coupled with the sporadic nature of the

alleged occurrences and Plaintiff's failure to show that the harassment was based on Plaintiff being African American precludes plaintiff from establishing the requisite prima facie case for a hostile work environment claim. Thus, Count III fails and summary judgment is appropriate.

**E.      *Respondeat Superior* / Failures to Supervise (Count VIII)**

In Count VIII of Plaintiff brings a failure to supervise and train claim pursuant to § 1983 and the Fourth Amendment against the Board and Superintendent Tyler in his individual capacity. Doc. 48 at ¶¶ 186–200.  Plaintiff claims Defendants "failed and/or refused to provide adequate training and supervision to its agents, staff, and servants, including Sinclair, in the lawful execution of their duties" and Defendants were "aware of a history of widespread abuse regarding [the Board]'s policies and procedures relating to discrimination and retaliation for protected activity and the need for training and supervision." *Id.* at ¶¶ 192-193.

Defendants argue that § 1983 liability cannot be based on a *respondeat superior* theory, and even if the Board votes or otherwise acts on a challenged employment action, uncommunicated racial or retaliatory animus on the part of a subordinate employee cannot be imputed on the Board. Doc. 116 at 39. Defendants are correct in that there is no *respondeat superior* liability under § 1983 that could hold a municipality responsible for wrongful actions of its employees.  *See Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998).  However, where a plaintiff identifies a policy or custom that causes their injury, a local government entity may be held liable:

> Plaintiffs who seek to impose liability on local governments under § 1983 must prove that "action pursuant to official municipal policy" caused their injury. *Monell*, 436 U.S. at 691, 98 S. Ct. 2018; *see id.*, at 694, 98 S. Ct. 2018.  Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law.  *See ibid.*; *Pembaur* [*v. City of Cincinnati*], 475 U.S. [469,] 480-81, 106 S. Ct. 1292[, 89 L. Ed. 2d 452 (1986)]; *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-68, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970).  These are "action[s] for which the municipality is actually responsible." *Pembaur, supra,* at 479-80, 106 S. Ct. 1292.

In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983. A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train. *See Oklahoma City v. Tuttle*, 471 U.S. 808, 822-23, 105 S. Ct. 2427, 85 L. Ed. 2d 791 (1985) (plurality opinion) ("[A] 'policy' of 'inadequate training'" is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*"). To satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." [*City of*] *Canton* [*v. Harris*], 489 U.S. [378,] 388, 109 S. Ct. 1197[, 103 L. Ed. 2d 412 (1989)]. Only then "can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Id.* at 389, 109 S. Ct. 1197.

"'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." [*Bd. of the Cty. Comm'rs of*] *Bryan Cty.* [*v. Brown*], 520 U.S. [397,] , 117 S. Ct. 1382[, 137 L. Ed. 2d 626 (1997)]. Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers chose to retain that program. *Id.* at 407, 117 S. Ct. 1382. The city's "'policy of inaction'" in light of notice that its program will cause constitutional violations "is the functional equivalent of a decision by the city itself to violate the Constitution." *Canton*, 489 U.S. at 395, 109 S. Ct. 1197 (O'Connor, J., concurring in part and dissenting in part). A less stringent standard of fault for a failure-to-train claim "would result in *de facto respondeat superior* liability on municipalities . . . ." *Id.* at 392, 109 S. Ct. 1197; *see also Pembaur, supra*, at 483, 106 S. Ct. 1292 (opinion of Brenna, J.) ("[M]unicipal liability under § 1983 attaches where-and only where-a deliberate choice to follow a course of action is made from among various alternatives by [the relevant] officials . . . .").

*Connick v. Thompson*, 563 U.S. 51, 60-63, (2011).

While Howell is correct that a governmental entity can be liable for its failure to train or supervise employees, "there are only 'limited circumstances' in which an allegation of a failure to train or supervise can be the basis for liability under § 1983." *Gold,* 151 F.3d at 1350 (citing *City of Canton*, 489 U.S. at 387 (1989)). A pattern of similar constitutional violations by untrained employees is "ordinarily necessary" to demonstrate deliberate indifference for purposes of failure to train. *Bryan Cnty.*, 520 U.S. at 409. Policymakers' "continued adherence to an approach that

they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action-the 'deliberate indifference'-necessary to trigger municipal liability." *Id.* at 407. Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights.

In *Brooks v. Scheib,* 813 F.2d 1191 (11th Cir. 1987), the Eleventh Circuit held that a city lacked notice of past police misconduct where ten citizen complaints about the specific police officer at issue had been made. *Id.* at 1193. The court reasoned that despite the number of complaints, the plaintiff "never demonstrated that past complaints of police misconduct had any merit" or had any relation to the specific conduct at issue so that the city "knew or should have known that the natural consequence of its policy and practices would be the deprivation of rights." *Id; see also Daniel v. Hancock Cnty. Sch. Dist,* 626 F. App'x 825 (11th Cir. 2015) (denying claim where a teacher – injured during altercation when sheriff's deputies, employed by school district, used pepper spray – failed to identify pattern of prior similar instances of alleged improper training and supervision that resulted in significant injuries to people whom district hired security to protect).

In the present case, Howell alleges "defendants' cursory review of policies, procedures, and practices utilized herein were blatantly insufficient and a reasonable official would have reasonably understood that a constitutional violation would be a known risk." Doc. 136 at 47. Further, "the blatant disregard and practice of EEO violations and its failure to supervise and train was evidence of deliberate indifference and a direct cause of Howell's constitutional deprivation." *Id.* Accepting this as fact, the allegations still fail to establish or even allege the elements essential to municipal liability claim.

Therefore, Plaintiff's Count VIII fails, and summary judgment is appropriate.

## VI.   MOTIONS TO STRIKE

The admission of expert testimony is governed by FED. R. EVID. 702, which provides that, if "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," a witness "qualified as an expert by knowledge, skill experience, training, or education may testify in the form of an opinion or otherwise."  FED. R. EVID. 702.  The U.S. Supreme Court elucidated this requirement in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and its progeny, noting that district courts are gatekeepers charged with ensuring that "speculative, unreliable expert testimony does not reach the jury."  *McCorvey v. Baxter Healthcare Corp.,* 298 F.3d 1253, 1256 (11th Cir. 2002).  In determining the admissibility of expert testimony under *Daubert,* the district court must consider whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable*;* and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.  *Rink v. Cheminova, Inc.,* 400 F.3d 1286, 1291-92 (11th Cir. 2005).  "While there is inevitably some overlap among the basic requirements — qualification, reliability, and helpfulness — they remain distinct concepts and the courts must take care not to conflate them."  *Rosenfeld v. Oceania Cruises, Inc.*, 654 F.3d 1190, 1193 (11th Cir. 2011) (citation omitted).

The district court's objective is to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004).  The proponent of the expert testimony bears the

burden of demonstrating that the expert is qualified to render his testimony, the methodology by which he reached his conclusions is sufficiently reliable, and his opinions will assist the trier of fact. *Id*.

If a witness' qualifications to render an opinion rest exclusively or primarily on experience, the witness "must explain *how* that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Id*. at 1261 (internal quotations and citation omitted) (emphasis in original). Reliability may not be premised "merely by the *ipse dixit* of an admittedly qualified expert." *Id*. When determining reliability, the district court may take into consideration a range of factors, including: (1) whether the expert's theory can be, and has been, tested; (2) whether the expert's theory has been subjected to peer review and publication; (3) whether the employed technique has a known error rate; and (4) whether the methodology is generally accepted in the scientific community. *Id*. at 1262; *McCorvey*, 298 F.3d at 1256. These factors, however, are non-exhaustive. *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 150 (1999). The district court has "broad discretion in determining whether to admit or exclude expert testimony, and its decision will be disturbed on appeal only if it is manifestly erroneous." *Evans v. Mathis Funeral Home,* 996 F.2d 266, 268 (11th Cir. 1993).

While a Court certainly should resolve Daubert motions prior to summary judgment when necessary, it does not have to resolve them if the result would not make a difference in the result.

**A.     Motion to Strike J.R. Brooks (Doc. 108)**

Plaintiff objects and moves to strike the expert testimony of J.R. Brooks expert testimony, report, and all exhibits corresponding thereto on various grounds. However, after a cursory review of the materials, the Court need not consider the information provided by Brooks to decide the issues presented in the motion for summary judgment and therefore resolving the motion on the

merits became unnecessary as they bore little material impact on Defendants' argument. Therefore, the motion to strike remains pending for resolution before trial as it may relate to the remaining claims brought under disparate treatment.

### B.    Motion to Exclude William Sauser, Jr. (Doc. 113)

Defendants move to strike the report and testimony of William I. Sauser, Jr., PhD. ("Dr. Sauser") and exclude him from giving opinions and/or testimony during the Summary Judgment proceedings and/or at the trial of this matter. However, even considering the information provided by Dr. Sauser, summary judgment is appropriate in this case.  Therefore, the Court need not resolve the motion on the merits as the Court considered the evidence and still found summary judgment appropriate. Therefore, the motion to exclude remains pending for resolution before trial as it may relate to the remaining claims brought under disparate treatment.

### VII.    CONCLUSION

Based on the foregoing discussion and analysis, it is hereby **ORDERED** that Defendants' Motion for Summary Judgment (Doc. 114) is **GRANTED in part** and **DENIED in part** as follows:

(1)    The motion is **GRANTED** as to Count I against Tyler in his official capacity and Counts II, III, IV, V, VIII, and Count IX in their entirety.

(2)    The motion is **DENIED** as to Count I against the Baldwin County Board of Education ("the Board").  Therefore, the Title VII and 42 U.S.C. § 1981 claims for disparate treatment will proceed to a jury trial.

(3)    The motion is **DENIED** as to Count VI.  The Court notes that the header did not include a reference to specific defendants, but that the Board, Eddie Tyler, and Jennifer Sinclair are all referenced. Therefore, the Court issues the following determinations as to Count VI:

a.      As to the Board, the motion for summary judgment failed to address it in its entirety. Therefore, summary judgment cannot be issued, and the claim will proceed directly to trial.

b.      As to the individual defendants, though there is the briefest of references to qualified immunity, there was insufficient analysis to make a final determination on summary judgment. While normally in such a circumstance the Court would simply determine that the issue not sufficiently briefed should proceed to trial, in recognition of the fact that qualified immunity should be determined at the earliest possible time and that the Court does have some questions, the Court will hold the determination **IN ABEYANCE** to permit supplemental briefing and oral argument. A separate order will issue setting the schedule for briefing on qualified immunity as to Count VI on the individual defendants. The Court will then hear the issue at the **February 9, 2024** hearing in conjunction with the *Daubert* hearing and pretrial conference.

(4)      The Court found that it did not need to resolve the Daubert motions (Docs. 108, 113) for the purposes of summary judgment, but those motions remain pending for resolution before trial.  The Court previously schedule a *Daubert* hearing and oral arguments on the motions to strike for **February 9, 2024 at 9:00 a.m.**  *See* Doc. 162.

Therefore, in summary, all that remains is Count I (disparate treatment) against the Board and Count VI (Equal Protection) against the Board, Sinclair, and Superintendent Tyler.  As to the individual defendants, the issue of qualified immunity has been held in abeyance and the Court will take up the issue on further briefing and by oral argument at the February 9, 2024 hearing and no final determination has been made as to the qualified immunity at this time.

**DONE** and **ORDERED** this the 24th day of January 2024.

/s/ Terry F. Moorer
TERRY F. MOORER
UNITED STATES DISTRICT JUDGE